UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DORIS WILLIAMS,
o.b.o. K.J.,

       Plaintiff,                                              Hon. Ellen S. Carmody

v.                                                                    Case No. 1:07 CV 1191

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/


**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security that owing to an improvement in her condition, K.J. was no longer disabled as of January 1, 2004.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is limited to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making his decision, and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). The

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

K.J. was born on March 5, 1991. (Tr. 358). She was subsequently found to be disabled as of January 1, 1993, due to mild mental retardation. (Tr. 98). The Commissioner reviewed K.J.'s status on May 8, 1997 and March 18, 2000, finding on both occasions that K.J.'s disability continued. (Tr. 98, 238-41, 343-49). On January 28, 2004, however, the Commissioner determined that K.J. had experienced sufficient medical improvement that she was no longer disabled as defined by the Social Security Act. (Tr. 60). This determination was affirmed on reconsideration. (Tr. 96-108). In response, K.J. requested a hearing before an Administrative Law Judge (ALJ). (Tr. 120-23).

On February 13, 2007, ALJ Dennis Matulewicz conducted a hearing at which the following individuals testified: (1) Plaintiff, Doris Williams, K.J.'s adoptive mother; (2) K.J.; and (3) medical expert, Dr. William Weil. (Tr. 207-35). In a written decision dated March 23, 2007, the ALJ determined K.J.'s condition had improved and that, therefore, her disability "ended as of January 1, 2004." (Tr. 15-30). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## BACKGROUND

On May 5, 1997, Dr. N. O. Anderson reported that K.J. "meets" Listing 112.05C (Mental Retardation) of the Listing of Impairments. (Tr. 344). This particular provision applied to individuals experiencing an "IQ of 60-69, inclusive, and a physical or other mental impairment imposing additional and significant restriction of function or developmental progression." 20 C.F.R., Part 202, Appendix 1, § 112.05C (1998).

On April 20, 1999, Gidget Whitaker, K.J.'s first grade teacher, completed a report regarding K.J.'s performance. (Tr. 266-67). Whitaker reported that K.J.'s "behavior is a problem." She reported that K.J. "roam[s] around" and "goes to bathroom and plays" several times daily. (Tr. 267). Whitaker reported that K.J. is "very talkative (disrupting others). . .all day." (Tr. 267). Whitaker observed that K.J. "does not understand what she is told" and responds to directions with "a blank stare." (Tr. 266). On May 6, 1999, Whitaker reiterated these concerns regarding K.J.'s behavior, adding that K.J. "argues constantly" and "yells sometimes." (Tr. 279).

On May 10, 1999, and May 13, 1999, K.J. participated in a battery of tests, the results of which revealed that K.J.'s "general cognitive ability" was "within the educable mentally impaired range." (Tr. 280-86). Specifically, K.J.'s verbal IQ was rated as 82, her non-verbal IQ was rated as 62, and her full-scale IQ was rated as 69. (Tr. 98, 283).

A May 26, 1999 report, completed by a school social worker, indicates that K.J. was experiencing "significant problems" in social and emotional functioning. (Tr. 268-70). The report also reveals that K.J. "constantly argues and yells at" her peers and was experiencing "problems following rules and staying on task." (Tr. 270). A June 6, 1999 school report indicates that K.J. is immature and in "constant need of attention" and "redirection." (Tr. 261).

On March 9, 2000, Marilyn Rairigh, K.J.'s second grade teacher, completed a questionnaire regarding K.J.'s activities. (Tr. 250-51). Rairigh reported that K.J. is "frequently out of her seat" and "seeks attention constantly." (Tr. 251). She reported that K.J. "seldom finishes tasks" and experiences difficulty working without supervision. (Tr. 251). Rairigh reported that K.J. "functions better in a structured setting." (Tr. 251). She observed that K.J.'s peers "have a difficult [time] relating to her." (Tr. 250). Rairigh also reported that K.J. had smeared feces in the restroom. (Tr. 251).

On March 18, 2000, Rom Kriauciunas, Ph.D., reported that K.J. suffered from "borderline intellectual functioning" and had not experienced any medical improvement in her condition. (Tr. 238-41).

A March 19, 2001 report completed by a school psychologist, reveals that K.J. engages in "sexually acting out behaviors" and "has difficulty with math, completing assignments, working independently, problem solving, and peer relationships." (Tr. 301). A neuropsychological evaluation revealed that K.J. was suffering from "significant neurocognitive compromise." (Tr. 303). Testing revealed that K.J. possessed a verbal IQ of 76, a performance IQ of 73, and a full-scale IQ of 73, which was consistent with "the borderline range of intellectual functioning." (Tr. 304-05).

An April 24, 2003 school report indicates that K.J. was a "good" reader, demonstrated "good" penmanship, and was "helpful" and "wants to please." (Tr. 125). K.J. was observed to be "making steady progress." (Tr. 125). The report indicates that K.J. enjoys "success in guided, closely supervised situations." (Tr. 127).

On November 18, 2003, Doris Williams completed a report regarding K.J.'s activities. (Tr. 136-39). Williams reported that K.J. was able to care for her personal needs, dress

herself, make her bed, and write letters. (Tr. 136-38). Williams reported that after school, K.J. watched television, read, or played with her brother. (Tr. 136). Williams reported that K.J. was able to help with household chores and had friends at school. (Tr. 136-38).

On January 14, 2004, Cerena Folesman, K.J.'s special education teacher, completed a questionnaire concerning K.J.'s performance. (Tr. 147-54). Folesman reported that she works with K.J. 10-12.5 hours weekly in the subjects of reading, writing, and math. (Tr. 147). Folesman reported that K.J., who was then in the sixth grade, read at a fifth grade level and performed math at a 3.0 to 4.7 grade level. (Tr. 147). Folesman reported that K.J. demonstrated "no problems" in the following areas: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; and (5) caring for herself. (Tr. 148-52).

On April 10, 2004, K.J. participated in a consultive examination performed by John Jeter, M.A., L.L.P. (Tr. 155-60). Jeter observed that K.J. was "cooperative, motivated" and worked "diligently." (Tr. 157). K.J.'s thoughts were "logical, organized, easy to follow, goal directed, [and] simple/concrete." (Tr. 157). K.J. exhibited "no unusual or bizarre behaviors" and her "tolerance for change" and "tolerance for positive criticism and frustration" were both "good." (Tr. 157).

K.J. was administered a battery of tests, during which she exhibited "good" eye contact and "positive" attitude. (Tr. 158). K.J. used "problem solving strategies with task completion and [her] responses were within the normal time limits." (Tr. 158). Jeter concluded that K.J.'s "attention, focus and persistence is good." (Tr. 158). Cognitive testing revealed that K.J. possessed a full-scale IQ score of 75. (Tr. 159). Testing further revealed that K.J. was reading at

a fifth grade level and performing math at a fourth grade level. (Tr. 159-60). Jeter concluded that K.J. experienced a "mild cognitive impairment." (Tr. 160).

A January 27, 2005 school report indicates that K.J. "is a strong reader, but she struggles with oral comprehension and math skills." (Tr. 173). K.J. was described as a "very sweet and quiet" person. (Tr. 172). School officials decided to place K.J. in the "general education curriculum" with "modified tests [and] assignments." (Tr. 174).

## ANALYSIS

The Commissioner is required to "periodically" review a child disability recipient's impairments to determine if the child is still eligible to receive disability benefits. 20 C.F.R. § 416.994a(a) (2007). When undertaking this periodic review, the Commissioner employs a three-step sequential process. 20 C.F.R. § 416.994a(b) (2007); *see also*, *Linville v. Astrue*, 2008 WL 4191618 at *1 (E.D. Ky., Sept. 10, 2008).

At the first step, it must be determined whether the child has experienced a "medical improvement[1] in the impairment(s) [she] had at the time of our most recent favorable determination or decision." 20 C.F.R. § 416.994a(b)(1) (2007). The most recent favorable determination or decision is referred to as the "comparison point decision" (CPD) and the impairment(s) that was present at the time of the most recent favorable determination or decision is referred to as the "CPD impairment(s)." Title XVI: Determining Continuing Disability at Step 2 of the Medical Improvement Review Standard Sequential Evaluation Process for Children Under Age 18 -

---

[1] Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable decision that you were disabled or continued to be disabled." 20 C.F.R. § 416.994a(c) (2006).

7

Functional Equivalence, SSR 05-03p, 2005 WL 1041037 at *1 (S.S.A., April 27, 2005).  As previously noted, the CPD in this matter is the March 18, 2000 determination by the Commissioner that K.J.'s disability continued.  The CPD impairments were mild mental retardation and poor attention and task completion in school, which were determined to meet Listing 112.05C of the Listing of Impairments.[2]  (Tr. 18-19, 98).

At step two, the Commissioner must determine if the child's impairments "still meet or equal the severity of the listed impairment that it met or equaled" at the time of the CPD.  20 C.F.R. § 416.994a(b)(2) (2007).  Precisely how this particular step is analyzed, however, depends on the date of the relevant CPD.  SSR 05-03p, 2005 WL 1041037 at *2.  If the CPD was rendered prior to January 2, 2001, as is the case presently, it was "based either on a finding that the child's impairment(s) met or medically equaled a specific listing, or functionally equaled a specific listing under the rules for functional equivalence that were in effect at the time of the CPD."  In such a circumstance, when the Commissioner undertakes the step two analysis he must "first consider whether the CPD impairment(s) now either meets or medically equals the same listing that it met, medically equaled, or functionally equaled at the CPD, as that listing was written at that time."  If such is the case, the child's disability will be deemed to continue.  If the CPD impairments, however, do not now meet or medically equal the CPD listing, the Commissioner must "consider whether the CPD impairment(s) now functionally equals the listings under [the] current rules" articulated in 20 C.F.R. 416.926a.  If such is the case, the child's disability will be deemed to continue.  If not, the analysis proceeds to step three of the process.  *Id.*

---

[2] As of this date, Section 112.05C of the Listings applied to individuals experiencing an "IQ of 60-69, inclusive, and a physical or other mental impairment imposing additional and significant restriction of function or developmental progression." 20 C.F.R., Part 202, Appendix 1, § 112.05C (2000).

8

At step three of the sequential process, the Commissioner must determine whether the child is currently disabled, considering all current impairments, including any impairments that were not present at the time of the CPD.  20 C.F.R. § 416.994a(b)(3) (2007).  In making this determination, the Commissioner must undertake the following steps: (1) does the child suffer from a severe impairment or combination of impairments; (2) do such impairments meet or medically equal the severity of any listed impairment; (3) do such impairments functionally equal a listed impairment.  20 C.F.R. § 416.994a(b)(3)(i)-(iii) (2007).

At step one, the ALJ found that "as of January 1, 2004, there had been a decrease in medical severity of the impairment present at the time of the CPD." (Tr. 19).  At the second step of the analysis, the ALJ determined that "[a]s of January 1, 2004, the impairment that [K.J.] had at the time of the CPD did not meet or medically equal section(s) 112.05C" of the Listings "as that listing was written at the time of the CPD."  (Tr. 19).  Specifically, the ALJ noted that "[t]he current evidence shows [K.J.'s] IQ scores are higher than the criteria for listing 112.05C, and therefore, she no longer meets or equals this listing." (Tr. 20).  The ALJ further determined at step two that as of January 1, 2004, "the impairment [K.J.] had at the time of the CPD did not functionally equal" a listed impairment.  (Tr. 20).

At step three, the ALJ found that as of January 1, 2004, K.J. suffered from the following severe impairments: (1) borderline intellectual functioning, (2) depression, and (3) bony feet.  (Tr. 25).  The ALJ further determined, however, that these impairments, whether considered alone or in combination, did not meet, medically equal, or functionally equal any listed impairment.  (Tr. 25-30).  Thus, the ALJ concluded that K.J.'s disability ended as of January 1, 2004.  (Tr. 30).

On appeal, Plaintiff asserts a single claim, challenging the ALJ's step one conclusion

that as of January 1, 2004, K.J. experienced a "medical improvement" in the impairments she had as of the date of the CPD. In support of his determination at step one, the ALJ relied on the January 14, 2004 report completed by Cerena Folesman, in which she reported that K.J. read at a fifth grade level and demonstrated "no problems" in the following areas: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; and (5) caring for herself.

The ALJ also relied on the results of the April 10, 2004, consultive examination in which K.J. participated. As detailed above, this examination revealed that K.J. was "cooperative, motivated" and worked "diligently." Her thoughts were "logical, organized, easy to follow, goal directed, [and] simple/concrete." She exhibited "no unusual or bizarre behaviors" and her "tolerance for change" and "tolerance for positive criticism and frustration" were both "good." When she participated in testing, K.J. exhibited "good" eye contact and "positive" attitude. She used "problem solving strategies with task completion and [her] responses were within the normal time limits." The examiner noted that K.J. exhibited "good" attention, focus and persistence. Cognitive testing revealed that K.J. possessed an IQ of 75. The examiner concluded that K.J. experienced a "mild cognitive impairment."

This evidence certainly supports the ALJ's finding that K.J. experienced an improvement in her condition. As described above, reports completed by school officials from 1999-2000, reveal that K.J. demonstrated significant behavioral problems. Cognitive testing revealed that K.J.'s abilities were within the mentally retarded range. Again, as detailed above, the evidence concerning K.J.'s behavior and cognitive ability subsequent to the CPD, reveal that K.J. experienced significant improvement in these areas. In sum, the Court finds that there exists substantial evidence

to support the ALJ's step one conclusion that K.J. experienced an improvement in her condition. Plaintiff has not challenged the ALJ's determination at steps two or three of the three step process described above. The Court has nevertheless reviewed these portions of the ALJ's decision and find them to be supported by substantial evidence as thoroughly detailed in the ALJ's decision. The ALJ's conclusion, therefore, that K.J.'s disability terminated as of January 1, 2004, is supported by substantial evidence.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  February 6, 2009                                         /s/ Ellen S. Carmody
                                                                ELLEN S. CARMODY
                                                                United States Magistrate Judge